UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.: 20-cv-23644-BB

TIMNESSIA BENTON, as Daughter )
And Next Friend, of LISA )
CASSANDRA BENTON, )
 )
      Plaintiff, )
vs. )
 )
CARNIVAL CORPORATION, )
a Foreign Corporation, )
 )
      Defendant )
 )
_____/

**PLAINTIFF'S MOTION FOR LEAVE TO FILE**
**SECOND AMENDED COMPLAINT**

    Plaintiff, TIMNESSIA BENTON, as Daughter and Next Friend of LISA CASSANDRA BENTON, pursuant to Fed.R.Civ.P. 16, hereby files this Motion for Leave to File a Second Amended Complaint, to add the following:

    (i)    Within Counts I and II, a claim for punitive damages,

    (ii)    Within Count IV, an additional allegation of negligent hiring with regard to the Ship's Doctor; Plaintiff having only recently learned that when the Ship's Doctor was hired, he did not possess minimally required ACEP[1] professional credentials and/or experience,

---

[1] ACEP stands for American College of Emergency Physicians.

   (iii)   Cleans up and corrects references in the First Amended Complaint to Plaintiff having initially fallen within her stateroom at 2:30 AM on June 7, 2019, when it was actually either 3:30 AM or 4:30 AM,[2] and

   (iv)   Replaces Ex. B with an accurate depiction of the Vessel's location at or about 5:00 AM on June 7, 2021, namely 22 nautical miles from the Port of Bridgetown, Barbados.

**Claim for Punitive Damages Based Upon the Ship's
Nurse Demanding Money as a Precondition to Awakening the Ship's Doctor
to Provide Emergency Medical Care**

1. This is a maritime personal injury claim brought by TIMNESSIA BENTON, on behalf of her mother, LISA CASSANDRA BENTON, who, while traveling as a cruise passenger aboard the CARNIVAL FASCINATION, presented to a nurse within the Ship's infirmary during the early morning hours[3] of June 7, 2019.

2. The nurse immediately advised that Plaintiff was likely suffering from the onset of a "stroke" but that the Ship's doctor would not be awoken, and no medical care would be provided

---

[2] The exact time of when Plaintiff awoke in her room and subsequently fell while walking to her bathroom is unknown, but best estimates are either 3:30 AM or 4:30 AM and that Plaintiff was later wheeled into the Ship's Medical Center by a nurse within 30 minutes, or by 4:00 AM or 5:00 AM, respectively. A Ship's Medical Log entry provides Plaintiff was examined by the Ship's nurse in the Medical Center at 5:01 AM on June 7, 2019. Throughout this Motion and for ease of reference Plaintiff's fall within her stateroom shall be referred to as having occurred at 3:30 AM and initial treatment in the Medical Center shall be referred to as having taken place at 5:00 AM.

[3] The "early morning hours" of June 7, 2019, refers to when Plaintiff first presented to the Ship's Medical Center. During her recent deposition TIMNESSIA BENTON testified it was her recollection that she and her mother presented to the Ship's Medical Center at approximately 1 AM, based upon her understanding that "Jun 7, 2019 05:01 UTC-04:00" (an entry within the Ship's Medical Center Logbook) required her to subtract "-04:00" hours from 05.01 hours to obtain Ship's Local Time. TIMNESSIA BENTON now appreciates that this math for arriving at Ship's Local Time was an error on her part as explained in the preceding footnote.

unless Plaintiff agreed to pay a $150.00 consultation fee and "thousands more dollars" for care and treatment that would likely follow considering the initial diagnosis of a stroke.

3. Plaintiff advised she could not truthfully commit to payment of the $150.00 and "thousands more dollars" since she had been disabled for nearly thirteen (13) years and was a Medicaid recipient. The nurse then advised the Ship's Doctor would not be awoken, no further medical care would be provided, and asserted Plaintiff was [allegedly] denying medical care and, therefore, must sign an Against Medical Advice (AMA) form before she would be allowed to leave the infirmary and return to her stateroom. Pressured as she was, the AMA was signed, and Plaintiff returned to her stateroom to rest.

4. Despite the Vessel arriving in Barbados three hours later, or at approximately 8 AM, it was not until more than 11 hours after the initial 5:01 AM visit to the Ship's Infirmary, at or about "June 7, 2019 16:15 UTC-04:00", per a Ship's Medical Log entry, that the Ship's Doctor, Jeffrey Comillas Balao, first spoke to and eventually provided Plaintiff with a medical consultation.[4]

5. During or shortly after the 4:15 PM consultation, the Ship's Doctor stated:

   a. The nurse should not have demanded the $150.00 consultation fee or commitment to pay later medical expenses because Plaintiff presented to the Infirmary with a stroke, that a stroke constitutes a Medical Emergency and, in such circumstances,

---

[4] A very curious entry appears in the Ship's Medical Logs, apparently suggesting there may have been an earlier attempt by the Ship's Doctor to call Plaintiff. A "June 7, 2019 09:08 UTC-4:00" entry provides:

> "Documentation of the encounter seen in secure in the morning at 0800 tried to call the cabin but the guest is not answering the phone."

As noted, the entry was apparently created more than an hour after the supposed effort to call Plaintiff's stateroom and suggests that no one staying in the Plaintiff's stateroom, four in total including Plaintiff, answered a call from the Ship's Medical Center.

*Benton v. Carnival Corp.*
*Case No.: 20-cv-23644-BLOOM/Louis*

CARNIVAL'S policy is to waive any demand for prepayment of a consultation fee and guarantee of payment for later incurred medical expenses, and

b. Plaintiff was, in fact, having a stroke and that because eleven (11) plus hours had lapsed the "golden period of thrombolytics [had] … passed" and "there wasn't much" that could be done for Plaintiff.

6. In further support of this Motion, Plaintiff relies upon the following testimony from Nurse Robby M. Babu, whose deposition was taken May 4, 2021, and in pertinent part, provides that it is CARNIVAL'S policy and procedure to waive any requirement to demand pre-payment for a consultation examination if a passenger/patient presents to the shipboard medical center with a medical emergency and a stroke constitutes a medical emergency, to wit:

> Q: Is there any exception within Carnival's policies, procedures, or protocols in the event of a medical emergency that the $150 should perhaps wait or be waived and that the medical care, emergency medical care should be provided without delay?
>
> A. Yes, if it is an emergency and the patient is having life-threatening condition, we will first have to give the medical care. And once everything is settled, then we will talk about the charges and all to patent or patient's bystander.
>
> Nurse Babu 05/04/21 Depo pg.104:07-18.
>
> *****
>
> Q: … Does Carnival consider a patient suspected of suffering a stroke, a medical emergency – not you, I'm asking does Carnival, per their policies and procedures, consider a patient who's considered as suffering a stroke, a medical emergency?
>
> A. Yes, sir.
>
> Nurse Babu 05/04/21 Depo pg.105:16-22
>
> *****

*Benton v. Carnival Corp.*
*Case No.: 20-cv-23644-BLOOM/Louis*

Q: … According to Carnival's policies and procedures, if a patient presents with a possibility of a stroke, it's considered a medical emergency, according to Carnival's policies; am I correct?

A. Yes.

Q. Okay. The determination of whether a patient is ultimately having a stroke, if I understand you correctly, is a determination that should be made by the ship's medical doctor. Am I correct?

A. Yes.

Q. Before the ship's medical doctor – before you would call the ship's medical doctor, you explained to confirm whether it was or was not a stroke, you explained to Miss Benton she had an initial charge of $150. Am I correct?

A. Yes.

Nurse Babu 05/04/21 Depo pg.109:08-14.

*****

Q. … My question was only limited to, *having suspected it was a medical stroke, you turned to her [Miss Benton] and said, you should be seen by the medical doctor for confirmation of a stroke or not, at least an examination, but that would at least cost $150.* That much is true, correct? (Emphasis Added)

A. Yes.

Nurse Babu 05/04/21 Depo pg.110:07-14.

*****

Q. My questions, sir, is this: Within this 5:01 [Ship's Medical Log] entry and the history obtained from Miss Benton, did you know, definitively know if you – if you weren't even certain it was a stroke, when she may have begun to suffer symptoms of a stroke?
    You said a moment ago she was not presenting with any stroke symptoms. Am I correct still?

A. Yes.

Q. Okay. So if she did not present, as far as you were concerned, with any symptoms of a stroke during the 5:01 entry, then you can't say, cannot say

> with any surety or definiteness when she began suffering from any stroke like symptoms; would that be true?
>
> Mr. Koonce:  Objection.
>
> A.: Yes, sir.
>
> Nurse Babu 05/04/21 Depo pg.118:03-18. *See* Nurse Babu's Depo excerpts attached hereto as Ex. "A".

7. Nurse Babu's testimony confirms he suspected Plaintiff presented to the Ship's Medical Center during the early morning hours of June 7, 2019 with symptoms consistent with the onset of a stroke, confirms he was so concerned Plaintiff was suffering from the onset of a stroke that he recommended an examination/consultation with the Ship's Doctor, confirms CARNIVAL considers passengers/patients that present with symptoms of a stroke as medical emergencies and, finally, confirms that demanding pre-payment of a $150 consultation fee was in violation of CARNIVAL'S policies and procedures when it came to medical emergencies.

8. Shipboard medical log entries and shoreside care that followed days later confirm Plaintiff indeed suffered an ischemic stroke and now most unfortunately suffers nearly complete right-side paralysis and is confined to a wheelchair for the remainder of her life.  See, recent photo of Plaintiff attached hereto as Ex. "B".[5]

---

[5] A further tragedy of this case is that Plaintiff's injuries were all avoidable.  These injuries include spending the remainder of her life with diminished cognitive abilities, difficulty with speech, confined to a wheelchair, incontinence, and dependency upon 24/7 assisted living, and more.  At 05:00 UTC-04:00, the very moment Plaintiff presented to the Ship's Medical Center, the Vessel, according to its Deck Log, was approaching the 12 NM boundary of Barbados, meaning shoreside emergency medical care was literally within sight.  See, Pages 6/45 & 7/45 of the Vessel's Deck Logbook attached hereto as Ex. "C".  Shipboard medical records also establish Plaintiff's initial onset of stroke like symptoms began earliest at 3:30 AM when Plaintiff fell in her stateroom while walking to her bathroom, or latest at 5:01 AM upon arrival in the Ship's Medical Center, meaning there was ample time within the 4-1/2 hour Thrombolytic Window to evacuate Plaintiff, land her shoreside, undergo a CT to confirm an

*Benton v. Carnival Corp.*
*Case No.: 20-cv-23644-BLOOM/Louis*

**Claim of Negligent Hiring the Ship's Doctor Having Recently Discovered Dr. Balao when Hired did not Possess Minimally Required ACEP Professional Credentials and/or Experience**

9.   CARNIVAL, directly or as a member of Cruise Lines International Association ("CLIA"), has adopted and/or accepted as minimal shipboard medical standards ACEP's Cruise Ship Health Care Guidelines, which in part provide:

> GUIDELINE 2: STAFF
>
> 2.1  Qualifications and Experience:  Maintains qualified and experienced clinical staff that have undergone a credentialing process to verify that:
>
> 2.1.3  Physicians have at least three years of post-graduate/post-registration experience in general and emergency medicine OR are board certified in emergency medicine or family medicine or internal medicine.
>
> 2.3  Skills:
>
> 2.3.1  Physicians with a competent skill level in Emergency Cardiovascular Care.

10. In further support of this Motion, Plaintiff relies upon the following testimony from Ship's Doctor Jeffrey Comillas Balao, M.D., whose deposition was taken May 17, 2021, and in pertinent part, provides that when hired he did not possess minimally required ACEP professional credentials and/or experience, to wit:

> Q. Okay.  So my point is, having ended your residency in 2009, did you have three years of postgraduate, post-registration experience in general or emergency medicine before working for Holland America in August of 2009?
>
> A. No, sir.
>
> Q. And you left Holland America in March of 2015, and three months later so, in June of 2015, began working for Carnival, correct?
>
> A. That's correct.

---

ischemic stroke and receive tPa (clot buster) to all but eliminate any negative lifelong consequences of the stroke – none of which was done.

Q. Okay. So if you did not have at least three years of postgraduate or post-registration experience in general and emergency medicine before working for Holland America and you left Holland America to go straight to work for Carnival, is it also true that you did not have at least three years of postgraduate, post-registration experience in general and emergency medicine before you began working for Carnival in June of 2015?

Mr. Koonce: Objection.

Q. Is that also true, sir?

A. Yes, sir. But I only – like I said, I only worked part-time during weekends, and I considered that as a postgraduate experience.

Ship's Dr. Balao 05/17/21 Depo pg.28:21-29:24. Dr. Balao's Depo excerpts attached hereto as Ex. "D".

11. Dr. Balao's own testimony proves he did not possess when hired by CARNIVAL the requisite minimal medical safety standards, training and/or experience to be working aboard CARNIVAL'S vessel as a Ship's Medical Officer.

## **MEMORANDUM OF LAW**

**I.    Legal Standard**

When a motion to amend is filed after a scheduling order deadline Fed.R.Civ.P. 16 is the proper guide for determining whether a party's delay may be excused. *Sosa v. Airprint Sys., Inc.*, 133 F.3d 1417, 1418, n. 2 (11th Cir. 1998). In assessing such a motion the Court employs a two-step analysis. *Id.* at 1419. First, the movant must demonstrate good cause under Rule 16(b) of the Federal Rules of Civil Procedure. Good cause exists when the deadline could not "be met despite the diligence of the party seeking the extension." *Id.* at 1418. Generally, courts consider three factors in assessing diligence: (1) whether the movant failed to ascertain facts prior to filing the pleadings or failed to acquire information during the discovery period, (2) whether the information supporting the proposed amendment was available to the movant, and (3) whether the movant

delayed in requesting leave to amend even after acquiring the information. *Id.* at 1419. If movant demonstrates good cause, the court proceeds to determine whether an amendment to the pleading is proper under Rule 15(a).

The present motion is premised upon newly discovered evidence in two recent depositions, as noted above. Under these circumstances the threshold inquiry under Rule 16 is satisfied. *See Vircigilo v. Work Train Staffing, LLC*, 674 Fed.Appx. 879, 885 (11th Cir. 2016) (holding that district court clearly did not abuse its discretion in finding good cause in granting plaintiff's motion for leave to amend where plaintiff did not have information necessary to assert the amendment in spite of diligence until after the scheduling order amendment deadline had expired.); *Emess Capital, LLC. v. Rothstein*, 2012 WL 13001838, at *6 (S.D. Fla. 2012) (finding good cause where motion for leave was brought within six weeks of court's dismissal order); *Southpoint Condo Association, Inc. v. Lexington Ins. Co.*, 2020 WL 639400, at *4 (S.D. Fla. 2020) (finding good cause to amend pleading under Rule 16 where the motion for leave to amend "was brought within weeks of defendant discovering the documents and records at hand"). *Stone Technology (HK) Ltd. v. GlobalGeeks, Inc.*, 2021 WL 86776 (S.D. Fla. 2021). This standard is also seemingly satisfied by the Court's recent Order on Motion to Compel Depositions and Unopposed Motion to Modify the Scheduling Order [DE 43], setting forth months of efforts on the part of Plaintiff to accomplish the depositions of various Defense witnesses with only two witnesses having been produced by CARNIVAL during this extended period of time.

The Defendant will suffer no prejudice if leave to amend is granted because the discovery deadline does not conclude until August 10, 2021, and the parties do not disclose experts and exchange expert witness summaries until July 13, 2021. Moreover, the dispositive motion deadline is September 1, 2021.

Moving on to the Rule 15 analysis, motions to amend pleadings are subject to a permissive, liberal standard, pursuant to which "the court should freely give leave when justice so requires." Rule 15(a)(2), Fed.R.Civ.P.; see also *Bowers v. U.S. Parole Com'n, Warden*, 760 F.3d 1177, 2014 U.S. App. LEXIS 13055, 2014 WL 3339497, *5 (11th Cir. July 9, 2014) ("District courts have limited discretion in denying leave to amend and should grant a motion to amend unless there are substantial reasons to deny it.") (citation and internal marks omitted). Substantial reason includes "undue delay, bad faith, dilatory motive on the part of the movant . . . undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Laurie v. Ala. Crim. App.*, 256 F. 3d 1266, 1274 (11th Cir. 2001).

## II. Analysis

Plaintiff seeks to add two claims as described above, one involving a claim for Punitive Damages against Defendant, CARNIVAL CORPORATION and the second, involving the Ship's Doctor admittedly not having minimal ACEP accreditations to have been hired by CARNIVAL. With regard to punitive damages, this Court only very recently solidified the availability of punitive damages in *Hall v. Carnival Corp.*, 2021 U.S. Dist. LEXIS 82047; 2021 UL 1699878, under strikingly disturbing facts. With regard to the Ship's Doctor not possessing minimally required ACEP accreditations / experience, this was only learned of during the Doctor's deposition taken May 17, 2021. Referring back to the Court's most recent Order [DE 14], the Court recently moved back certain deadlines and the trial of this cause by two (2) months, thereby allowing sufficient time to address all matters that might be raised should this Court grant this Motion.

### A. No Undue Delay

Undue delay could be found when a party waits several months after the deadline to amend has passed before filing a motion to amend. *See, Jennings v. BIC Corp.*, 181 F.3d 1250, 1258-59

(11th Cir. 1999) (undue delay found when the plaintiff waited <u>thirty-four months</u> after their original complaint was filed, five months after the district court's deadline for amending the pleadings and <u>two months</u> before the trial was scheduled to begin); *Saewitz v. Lexington Ins. Co.*, 133 Fed. Appx. 695, 700 (11th Cir. 2005)(finding undue delay when the plaintiff waited more than six months after the deadline to amend and after the extended discovery deadline to file a motion to amend). The Court entered the Order Setting Trial and Pre-Trial Schedule [D.E. 14] on November 24, 2020. The relevant information learned as set forth above was revealed during recent depositions taken May 4, 2021, and May 17, 2021. The depositions in this case have been unnecessarily delayed as Plaintiff's initial attempt to set depositions was on February 11, 2021. Undersigned did not receive dates for the requested depositions until March 29, 2021, which was a lapse of almost two months, and only after a hearing as Defendant insisted on taking Lisa Benton's deposition before any other witness. This same delayed process was again repeating itself, until very recently when CARNIVAL did provide dates to accomplish several additional depositions, including Nurse Leidy Johana Soto and Defendant's Corporate Representative.

Therefore, Plaintiff submits that due to the circumstances of the instant case undue delay does not exist.

**B. No Bad Faith**

Examples of bad faith include use of a motion to amend as a means to postpone the trial date, to impose additional expense on the opposing party, and to gain leverage in settlement negotiations. *Millar v. Bay Area Rapid Transit Dist.*, 236 F. Supp. 2d 1110, 1113 (N.D. Cal. 2002). The trial of this matter is not set until February 14, 2022. Plaintiff has been diligently attempting to move discovery forward as expeditiously as possible as evidenced by repeated requests upon CARNIVAL and motions filed with this Court.

*Benton v. Carnival Corp.*
Case No.: 20-cv-23644-BLOOM/Louis

### C. No Undue Prejudice

"Undue prejudice is not mere harm to the non-movant but a denial 'of the opportunity to present facts or evidence which [] would have [been] offered had the amendment [] been timely.'" *Dove v. Washington Metro. Area Transit Auth.*, 221 F.R.D. 246, 248 (D.D.C. 2004) (stating that examples of undue prejudice would be if the amendments altered the choice of counsel or the nature of the opposing party's strategy). TIMNESSIA BENTON has been deposed and Plaintiff has just within the last week reached an agreement for the Parties to complete five (5) more depositions of various important witnesses in this cause. The Defendant will not be unduly prejudiced by the amendment.

### D. No Futility

"A proposed amendment to a pleading would be futile if it could not withstand a motion to dismiss pursuant to Rule 12(b)(6)." *Oneida Indian Nation of New York v. City of Sherrill*, 337 F.3d 139, 168 (2d Cir. 2003) rev'd on other grounds, 544 U.S. 197, 125 S. Ct. 1478, 161 L. Ed. 2d 386 (2005) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)). Therefore, "[f]or the purposes of evaluating futility, the 12(b)(6) standard is applied: all well pleaded allegations are accepted as true, and all inferences are drawn in favor of the pleader." *E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 282 (S.D.N.Y. 2006) (citing *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1174 (2d Cir. 1993)). A proposed claim is not futile if the "factual allegations are enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

With regard to punitive damages, this Court only very recently solidified the availability of punitive damages in *Hall v. Carnival Corp.*, 2021 U.S. Dist. LEXIS 82047; 2021 UL 1699878,

under strikingly disturbing facts. With regard to the Ship's Doctor not processing minimally required ACEP accreditations / experience, this was only learned of during the Doctor's deposition taken May 17, 2021, and the lack of qualifications was admitted to by the Ship's Doctor.

### III.   Conclusion

The Court, applying the facts to the law for allowing the amendment of pleadings, should conclude Plaintiff's Second Amended Complaint is proper and grant this Motion.

WHEREFORE, Plaintiff respectfully requests the Court grant this Motion and allow Plaintiff to file the attached proposed Second Amended Complaint, attached as Exhibit "E".

Respectfully submitted,

**BRAIS LAW FIRM**
*Counsel for Plaintiff*
Dadeland Office Park
9300 S. Dadeland Blvd., Suite 101
Miami, Florida 33156
Telephone: (305) 416-2901
Facsimile:  305) 416-2902

By: */s/ Keith S. Brais*
    KEITH S. BRAIS
    Florida Bar No.: 863319
    kbrais@braislaw.com
    MICHELLE Y. GURIAN
    Florida Bar No.: 100312
    mgurian@braislaw.com
    *Attorneys for Plaintiff*

### LOCAL RULE 7.1(A)(3) CERTIFICATION

The undersigned counsel hereby certifies in accordance with Local Rule 7.1(a)(3) of the U.S. District Court for the Southern District of Florida that counsel for the parties conferred about the relief requested herein and CARNIVAL opposes the relief sought herein.

*Benton v. Carnival Corp.*
*Case No.: 20-cv-23644-BLOOM/Louis*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 2, 2021, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I ALSO CERTIFY that the foregoing document is being served this day on all counsel of record or pro se parties identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or is some other authorized manner for those counsel or parties who are not authorized to electronically receive Notices of Electronic Filing.

*/s/ Keith S. Brais*
Keith S. Brais, Esq.
Florida Bar No.: 863319

*Benton v. Carnival Corp.*
Case No.: 20-cv-23644-BLOOM/Louis

## SERVICE LIST

*Benton v. Carnival Corp.*
Case No.: 20-cv-23644-BB

| | |
|---|---|
| Keith S. Brais, Esq.<br>Email: kbrais@braislaw.com<br>Florida Bar No.: 863319<br>Michelle Y. Gurian<br>Email: mgurian@braislaw.com<br>Florida Bar No.: 100312<br>**BRAIS LAW FIRM**<br>9300 S. Dadeland Blvd.<br>Suite 101<br>Miami, Florida 33156<br>Telephone: (305) 416-2901<br>Facsimile: (305) 416-2902<br>*Attorneys for Plaintiff* | THOMAS SCOLARO, ESQ.<br>Email: scolaro@leesfield.com<br>Florida Bar No.: 178276<br>Thomas D. Graham<br>Email: graham@leesfield.com<br>Florida Bar No.: 89043<br>**LEESFIELD SCOLARO, P.A.**<br>2350 South Dixie Highway<br>Miami, Florida 33133<br>Telephone: (305) 854-4900<br>Facsimile: (305) 854-8266<br>*Co-Counsel for Plaintiff* |
| PHILIP D. PARRISH, ESQ.<br>Email: phil@parrishappeals.com<br>**PHILIP D. PARRISH, P.A.**<br>7301 S.W. 57th Court<br>Suite 430<br>Miami, Florida 33143<br>Telephone: (305) 668-6410<br>Facsimile: (305) 667-6161<br>*Co-Counsel for Plaintiff* | GEORGE E. KOONCE, ESQ.<br>Email: gkoonce@fowler-white.com<br>Florida Bar No.: 519261<br>CAMERON W. EUBANKS, ESQ.<br>Email: ceubanks@fowler-white.com<br>Florida Bar No.: 85865<br>CHRISTOPHER C. KNIGHT<br>Email: cknight@fowler-white.com<br>Florida Bar No.: 607363<br>**FOWLER WHITE BURNETT, P.A.**<br>1395 Brickell Avenue<br>Brickell Arch, Fourteenth Floor<br>Miami, FL 33131<br>Telephone: (305) 789-9200<br>Facsimile: (305) 789-9201<br>*Attorneys for Defendant* |